49 CCPA

**Application of Chester John CAVALLITO and Allan Poe Gray.**

**Patent Appeal No. 6822.**

United States Court of Customs and Patent Appeals.

July 25, 1962.

---

506

Laurence & Laurence, Washington, D. C. (Dean Laurence and Herbert I. Sherman, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

We are here concerned with the rejection of claims 1, 12–15, inclusive, and 35 of appellants' application Serial No. 593,058, filed June 22, 1956, entitled "Organic Compounds". Claims 2, 3, 4, 7, 9 and 11 have been allowed.

Typical of the claims on appeal are claim 1, directed to a composition of matter, and claim 12, directed to a process for preparing the composition of matter. These claims are as follows:

"1. Polycarbon lower alkanes substituted on different carbon atoms by: (a) one onium-N-attached quaternary ammonium moiety having a radical weight, excluding the anion, not in excess of about 117 in which the onium-N substituents are *three lower-aliphatic groups* of which two can be joined to form a ring which can contain a hetero linking atom, and, (b) a second onium-N-attached quaternary ammonium moiety having a radical weight, excluding the anion, of at least 150 in which the onium-N is a member of a substituted -C$_5$N ring whereof not more than one ring atom forms part of another ring system and wherein not more than one of the 2- and 6- positions of the C$_5$N ring is substituted when the C$_5$N ring is a substituted pyridine ring; and, wherein the electrostatic charges of the quaternary ammonium moieties are satisfied by the presence of two anions." [Emphasis added.]

"12. The process of preparing unsymmetrical bisquaternary ammonium salts which includes: quaternizing a substituted -C$_5$N ring compound having a molecular weight of at least 150 with an omega-haloalkyl ammonium salt, said salt containing one onium-N-attached quaternary ammonium moiety having a radical weight, excluding the anion, not exceeding about 117 in which the onium-N substitutents are *three lower-aliphatic groups* of which two can be joined to form a ring which

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

can obtain a hetero linking atom."
[Emphasis added.]

Claim 35 differs from claim 1 in two respects. (1) There is an upper limit of 350 given to the radical weight of the larger moiety, and (2) a limitation on the substituents is stated in the final clause of the claim which appellants assert make "clear that the substitutents are non-ionic".

Claims 12–15 are process claims directed to making the compounds claimed in claims 1 and 35.

The board affirmed the rejection of all the appealed claims on the basis of the following prior art:

Erickson 2,617,806 Nov. 11, 1952

Moreno, Chem.Abstracts, Vol. 49, col. 15070–(1955); Clemo et al., J. Chem.Soc., Vol. of 1954, pp. 2582–2584; Bergstrom et al., Chem.Abstracts, Vol. 40, col. 870–871 (1946)

Our analysis of the rejections narrows the issues to be here considered to two: (1) that arising from the rejection of claims 1 and 35 as broader than the disclosed invention because of the inclusion therein of the term "lower-aliphatic groups" and (2) that arising from the rejection of claims 12–15, inclusive, as "unpatentable" over the cited art.

Although claims 1 and 35 were rejected on several grounds,[1] our decision as to the issues on appeal raised by the rejection of these claims as "broader than the disclosure" and as "based on an inadequate disclosure", is dispositive of them.

As stated by the board:

"The issue raised by this rejection is not easy to resolve because it is necessary to make a side-by-side comparison of the nature and scope of the disclosure with the nature and scope of the claims. The general legal principles are well understood, but their application to the facts of a particular case requires the exercise of a sharp sense of discrimination and a fine degree of judgment."

On the first issue, we agree with the board that the term "lower-aliphatic groups", contained in claims 1 and 35, gives these two claims a breadth greater than that warranted by the written description of the invention as found in the specification. We think, therefore, as to these claims that the present case is governed by our previous decision in In re Cavallito and Gray, 282 F.2d 357, 48 C.C.P.A. 711, rather than by our decision in In re Cavallito and Gray, 282 F.2d 363, 48 C.C.P.A. 720, as appellants have contended.

The pertinent portions of 35 U.S.C. § 112 [2] which are directly involved in the rejection of claims 1 and 35 are the same as those considered in our opinion in In re Sus and Schaeffer, 49 CCPA ——, 306 F.2d 494.

We think the legal principles governing the sufficiency of the disclosure to support broad claims are correctly summarized by our statement in In re Cavallito and Gray, supra, that:

"* * * The sufficiency of a disclosure depends not on the number but rather on the nature of the claimed compounds *per se* and the nature of the supporting disclosures.

1. Other issues raised and argued in connection with claims 1 and 35 but which shall not be here considered include: (1) the rejection of claim 35 as involving a Markush group of diminished scope over claim 1, and (2) whether the claims are, in fact, in Markush form. However, in our consideration of these issues we note inter alia the article in XXXVII Journal of the Patent Office Society, 164 et seq., which neither the applicant nor the solicitor referred to but which contains a very comprehensive consideration of the subject of Markush claims.

2. The pertinent portions of 35 U.S.C. § 112 to be here considered are:
"The specification shall contain a *written description of the invention* * * *.
"The specification shall conclude with one or more claims particularly pointing out and distinctly *claiming the subject matter which the applicant regards as his invention.*" [Emphasis added.]

If a claim covers compounds which are closely related, a comparatively limited disclosure may be sufficient to support it. If, however, the claim covers compounds which are related only in some structural respects, a more extensive supporting disclosure may be necessary to support it. Moreover, the selection of the examples and other exemplary material used as the disclosure to support a claim must be adequately representative of the area covered by it. In some instances a limited disclosure which is typical of various areas covered by a claim may be of greater value in determining the patentable characteristics of the claimed compounds than a more extensive disclosure would be if related only to a limited portion of the area."

Since the problem here is in applying these principles to the particular facts of the present appeal, we shall pass directly to a determination of what is contained in the "written description of the invention" in appellants' specification and then to a determination of whether this written description is of adequate scope to support rejected claims 1 and 35.

The organic compounds disclosed in the specification are unsymmetric bis-quaternary ammonium salts. The specification emphasizes the molecular structure of the compounds and states that "the invention resides in the concept of a composition of matter" having a particular molecular structure which is illustrated diagrammatically in the specification as follows:

larger moiety    smaller moiety

Following this diagrammatic illustration, the specification states:

"The smaller moiety of the molecular structure has a radical weight not exceeding 117 and is made up of a quaternary nitrogen atom bearing substitutents ($R_1$, $R_2$, $R_3$) such as three lower-alkyl or lower-alkenyl groups, which are the same or different; or, the moiety is an N-heterocyclic radical, which heterocyclic radical may also include an oxygen or sulfur atom, having a lower-alkyl or lower-alkenyl radical also attached to the heterocyclic N atom. The sum of the carbon atoms in the substitutents attached to the quaternary N in the smaller moiety should not be greater than about 7, and preferably, at least one of said substituents is the methyl radical."

The specification also states:

"The physical embodiments of this concept are solids having relatively high melting points and exhibit applied use characteristics in that they possess very unusual hypotensive activity of varying duration, and, ganglionic blocking properties, which two characteristics vary independently with relation to changes in molecular structure in any series of the various members or compounds of the composition."

The specification contains some 90 examples which appellants in their brief characterize as "fairly representative of the field covered by the claims." It also contains detailed exemplary material which, appellants assert in their brief, teach "the various types of components which are included and how to make them."

The specification describes the critical limits of the invention in the rejected claims as follows:

"The smaller moiety of the molecule consists of a cationic quaternary ammonium group and it is critical that the atoms of such moiety not exceed a total weight of about 117. The preferred substituents attached to the N atom of this

moiety are three lower-alkyl radicals from the group: methyl, ethyl, n-propyl, and isopropyl. Two of these radicals may be joined to form with the said N-atom a small heterocyclic radical, such as pyrrolidino, methyl-pyrrolidino and piperidino, and the heterocycle may include an oxygen or sulphur atom, as in the morpholino and thiamorpholino radicals.

"The larger moiety of the molecule also is a cationic quaternary ammonium group which has a radical weight of at least 150, preferably in the range between about 175 and 350, and should contain a minimum of polar substitutent radicals other than that of the aforementioned onium group. Fundamentally, the larger grouping involves a pyridine ring, and the pyridine ring can be substituted by a wide variety of radicals and may be partially or completely hydrogenated to eliminate unsaturation from the ring.

"The lower-alkylene bridge between the two quaternary ammonium moieties has at least two and preferably not more than about six carbon atoms therein and can be straight or branched chain. The optimum pharmacological activity appears to reside in physical embodiments of the concept wherein the bridge has three carbon atoms."

At the oral argument, counsel for appellants emphasized the particular molecular structure of compounds embodying the claimed invention and related this structure to the characteristics of the compounds which, as stated in the specification, have the "unusual hypotensive activity of varying duration, and, ganglionic blocking properties." There appears to be no question but that as stated in the specification, these "two characteristics vary independently with relation to changes in molecular structure in any series of the various members or compounds of the composition."

The particular issue arises here because of appellants' use of the term "lower-aliphatic groups" in rejected claims 1 and 35. As stated by the board:

"It is the examiner's view that 'lower-aliphatic groups' covers any open-chain radical whatsoever and that when two are joined in a heterocycle, the hetero linking atom may be of any character within the total limit of radical weight. With respect to the substituted $-C_5N$ ring, the examiner holds that, with only a few restrictions, there is practically no limit to the number and type of substituents. The examiner underscores this rejection by pointing out that in the medical field such scope is highly speculative and may include materials not useful for the intended purpose, referring to the difference between a bridging lower-alkane of two carbon atoms and a bridging lower alkane of a larger number of carbon atoms which may be branched."

Appellants take the position that this' term does not include *substituted* lower aliphatic groups. This position is stated in their brief as follows:

" * * * But appellants use the term in its commonly accepted meaning which does not include any *substituted* lower-aliphatic group. As pointed out to the Board, the term 'aliphatic' is defined in Hacks's [sic] 'Chemical Dictionary', 3rd ed., as 'Acyclic.' 'Pertaining to an open chain carbon compound; as paraffins or olefins.' These contain only carbon and hydrogen atoms. This is exactly how the term is used in the instant claims. The exact term used is 'lower aliphatic groups' not 'substituted lower aliphatic'. * * *"

We cannot agree with appellants that the term "lower-aliphatic groups" in its commonly accepted meaning does not include any substituted lower-aliphatic group. The definition from Hackh's Chemical Dictionary, 3rd Ed., cited by appellants, supra, uses "paraffins and olefins" only as examples of aliphatic carbon compounds. We do not think

these two examples, which happen to be unsubstituted, were meant by the editors to indicate that all examples of an aliphatic compound must be unsubstituted. Other accepted chemical authorities[3] indicate that the term aliphatic should not be so limited.

Appellants have not stated in their specification that the term "lower-aliphatic groups" should be limited to a meaning which excludes substituents. The word "aliphatic" is used in the specification only in connection with the solvents used in preparing the compounds claimed by appellants, e. g., the specification describes "a wide variety of solvents such as aliphatic or aromatic hydrocarbons, alcohols, ethers, et cetera, * * *". This use of the term "aliphatic" gives no support in the specification for the limited meaning of the term "lower-aliphatic groups" urged by appellants. Therefore, we think it a fair interpretation of the claims to say that they call for "three lower-aliphatic groups", substituted or unsubstituted, chosen so that the radical weight of the onium-N-attached quaternary ammonium moiety, excluding the anion, is "not in excess of about 117."

■ As pointed out in In re Sus and Schaeffer, supra, the defect of such a claim is not that it is broad, but that it is broader than the written description of the invention in the specification, and hence that the claims are not supported by the disclosure.[4] While the language

under consideration appears in original claim 1, and hence is part of the original specification disclosure, (see Sec. 706.03 (n), Manual of Patent Office Examining Procedure), if it is to be considered as supporting the claim in which it is used, it should also be added to the written description of the invention contained in the specification. (Ibid.) The present record does not indicate that this has been done. Mindful as we are of the problems which may arise by reason of the incorporation of new matter in a specification in support of a claim such as claim 1, (cf. Sec. 608.01(o), M.P.E.P.), we do not think it either desirable or incumbent upon us to here consider the possible allowability of the appealed claims on the basis of an assumption as to what, if any, amendment to the specification may be warranted by the disclosures of original claim 1.

On this aspect of the case we agree with the statement in the solicitor's brief that:

"Insofar as appellants urge * * that the claims are not broader than the disclosure because claim 1 is an original claim, it suffices to say that that fact alone is not conclusive upon whether the rejection is obviated. In re Ware, 29 CCPA 1106, 129 F.2d 552 [54 USPQ 200]; In re Moore, 33 CCPA 1083, 155 F.2d 379 [69 USPQ 524]. Furthermore, the mere fact that applicants use broad

3. "aliphatic—Organic compounds whose molecules do not have their carbon atoms arranged in a ring structure. This category therefore includes all the paraffin hydrocarbons *and their saturated and unsaturated derivatives of all types.*" [Emphasis added.] (The Condensed Chemical Dictionary, 6th Ed., p. 38).

"aliphatic compounds—Aliphatic compounds are organic compounds having an open-chain (noncyclic or acyclic) carbon skeleton. The term 'aliphatic' is derived from *aleiphatos*, the Greek word for fat, which is the source of many of the aliphatic compounds. Aliphatic compounds include paraffin hydrocarbons, olefins (ethylenic hydrocarbons), and acety-

lenic hydrocarbons, *and their derivatives of all types.*" [Emphasis added.] (Encyclopedia of Chemical Technology, Vol. 1, Kirk and Othmer, p. 356).

"aliphatic * * *: Fatty, acyclic —used of a large class of organic compounds characterized by an open-chain structure and consisting of the paraffin, olefin and acetylene hydrocarbons *and their derivatives* (as the fatty acids); distinguished from alicyclic, aromatic, heterocyclic ⟨~ terpenes⟩ " [Emphasis added.] (Webster's Third New International Dictionary, p. 53).

4. Cf. "Broader Than the Disclosure in Chemical Cases" by Samuel S. Levin, XXXI J.P.O.S. 5.

or generic terminology in their application, as is urged here * * *, does not necessarily entitle them to claim the subject matter broadly."

There is no question but the term in question in rejected claims 1 and 35 is such a broad term that it will embrace subject matter not disclosed in the specification. The specification does not disclose any factors governing the selection of the claimed "three lower-aliphatic groups," to achieve the claimed "one onium-N-attached quaternary ammonium moiety having a radical weight, excluding the anion, not in excess of about 117," and thus contains little more than suggestions for experimentation. Cf. Schering Corporation v. Gilbert, 153 F.2d 428 (C.C.A.2d, 1946).

Appellants urge that the inclusion of some 90 examples in the specification warrants the allowance of claims of the scope of claims 1 and 35. We agree with the board's analysis of the specification that:

"It is apparent from the foregoing that appellants have disclosed the pharmocological effectiveness of only five very closely related compounds, all falling within a strictly limited category of the extremely large group of compounds claimed."

We also agree with the statement of the solicitor in his brief that:

"The Board could also have observed that 88 of the 90 examples appellants mention (all except 9 and 10) had the same trimethyl group. No other 'lower aliphatic groups', as defined in claim 1, are specifically disclosed."

We think the following conclusions are supported by the foregoing analysis:

"(1) The specific examples of the specification do not support the broad terminology 'lower-aliphatic groups' used in appealed claims 1 and 35.

"(2) There is no statement in the specification that all the compounds disclosed possess the unique hypotensive and ganglionic blocking properties which are disclosed as the 'applied use characteristics' of the compounds which are disclosed as the physical embodiments of the molecular structure which is said to be appellants' inventive 'concept.'"

■ The first conclusion requires affirmance of the board's decision on claims 1 and 35 for the legal reasons more fully discussed in our opinion in In re Sus and Schaeffer, supra.

The second conclusion requires affirmance of the board's decision on claims 1 and 35 for the legal reasons more fully set forth in our opinion in In re Cavallito and Gray, 282 F.2d 357, 48 C.C.P.A. 711, supra.

■ Process claims 12 through 15 were rejected by the examiner as "unpatentable over Erickson". In sustaining this rejection, the board stated:

"We will sustain the indicated rejection of process claims 12 through 15 because there is nothing unobvious in carrying out an admittedly 'known type reaction' with analogous materials and appellants have offered no reason for any expectation that the disclosed reaction would be different or inoperative in connection with starting materials wherein R is somewhat lighter or R 'N is somewhat heavier. The novelty of the final product does not serve to establish that the method for preparing it is unobvious because, on the contrary, the nature of the procedure and the involved chemical reaction is quite similar to the prior art."

We have carefully considered the disclosures of the Erickson reference but do not agree with the board that it would lead one of ordinary skill in this art to utilize the starting materials disclosed by appellants in appellants' process to make appellants' admittedly novel final product. We therefore *reverse* the de-

cision of the board as to claims 12 through 15.

We note, however, that appellants have used the broad term "lower-aliphatic groups" in defining the starting materials in all the rejected process claims. While as previously set forth, we agree that the board properly held this term to be broader than and unsupported by the disclosure in its rejection of claims 1 and 35, it is noted that the board did not reject process claims 12 through 15 on this basis, hence this issue as to these claims is not before us on the present appeal.

Modified.

MARTIN, Judge, did not sit or participate because of illness.

KIRKPATRICK, Judge (dissenting).

I am unable to agree with the majority as to the modification of the decision of the board. In my opinion that decision should be affirmed in its entirety.