57 CCPA

**Application of Lynn B. WAKEFIELD and Frederick C. Foster.**

**Patent Appeal No. 8192.**

United States Court of Customs and Patent Appeals.

March 12, 1970.

As Modified on Denial of Rehearing May 21, 1970.

Edward S. Irons, Mary Helen Sears, Irons, Birch, Swindler & McKie, Washington, D. C., Stanley M. Clark, H. N. Harger, Akron, Ohio, attorneys of record, for appellants.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Raymond E. Martin, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and MATTHEWS, Senior Judge, United States District Court for the District of Columbia, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, which affirmed the rejection of product claims 1–3, 5–8, 10–17, 19–22, 24–26 and 28–31 in appellants' patent application serial No. 199,603, filed June 4, 1962, for "Essentially *Cis* Rubbery Polyisoprene and Method for Making Same." The application is a continuation-in-part of applications serial No. 530,396, filed August 24, 1955, and serial No. 605,438, filed August 21, 1956. Four method claims have been allowed.

## THE DISCLOSURE

The application discloses a method of making a synthetic polyisoprene having essentially the molecular structure of natural Hevea rubber, i. e., at least 80% *cis*-1, 4, not more than 10% *trans* 1, 4, not more than 10% 3, 4, and practically no 1, 2 structure. The synthetic product will then have the advantageous properties of natural rubber but will not contain the proteins, soaps, resins and sugars which are disadvantageously present in natural rubber. The disclosed process of making the synthetic product involves the use of a catalyst which may be metallic lithium, a hydrocarbon lithium compound, a crystalline salt in admixture with colloidally dispersed lithium metal, a composite comprising either lithium metal or a lithium hydrocarbon in association with a fluorine-containing salt, or a Ziegler type catalyst. Information on selection and use of each of the catalysts is set forth in the specification but is unnecessary for an understanding of the issues here. Seventeen examples are disclosed in the specification to detail the use of the various types of catalysts.

## THE INVENTION

Claim 1 is illustrative of the claims on appeal.

1. A synthetic homopolymer [of] isoprene combining the desirable properties of both Hevea and sulfur vulcanizable synthetic rubbers characterized by at least 80% *cis*-1, 4, structure, not in excess of 10% *trans*-1, 4 structure, not in excess of 10% 3, 4 structure, and essentially no 1, 2 structure, said homopolymer being free from the proteins, soaps, resins and sugars present in natural Hevea rubber.

The other appealed claims add one or more limitations to the subject matter of claim 1, and we shall discuss them in more detail later.

## PRIOR ART

Horne, U. S. patent 3,114,743, issued December 17, 1963, filed December 2, 1954, discloses a cis-1, 4 polyisoprene rubbery polymer which has essentially the same structure and physical properties as natural Hevea rubber. Horne states that all of the isoprene formed by his method is of the cis-1, 4 structure and that it is free from protein, soaps, resins and sugars. Applicants attempted to remove Horne as a reference by submitting affidavits under Rule 131.

The examiner and the board also applied Davis et al., Chemistry and Technology of Rubber, 1937, pp. 91–92, alone as a reference under 35 U.S.C. § 103. Davis discloses the structure of natural Hevea rubber and describes attempts to purify it.

## THE EXAMINER

The examiner rejected all the appealed claims for undue multiplicity under 35 U.S.C. § 112 and required that applicants either reduce the number of claims to fifteen or select fifteen claims for further examination on the merits. Applicants traversed this rejection and provisionally elected fifteen claims for further prosecution. The examiner refused to withdraw the multiplicity rejection and continued to apply it to all claims. He also rejected all the claims for failing to define the invention and for obviousness in view of Davis. He further rejected claims 1, 3 and 5–8 for lack of novelty based on Horne, and the remaining claims for obviousness in view of Horne.

## THE BOARD

The board affirmed all of the examiner's rejections. We shall separately treat each affirmance and state our opinion with regard thereto.

## OPINION

### (a) *Multiplicity*

■■ The board stated that many of the claims recite "only the obvious vulcanizate of the homopolymer, with varying recitations of its properties stemming from the negative recitation" appearing in claim 1. Other claims, said the board, merely give a somewhat more restricted range of percentages of the various structures in the polymer. The board agreed with the examiner that if the polyisoprene is adequately defined in each claim, then claims reciting the inherent properties of the polymer are unnecessary and tend to confuse the issue. The board held the number of claims to be unreasonable and to have the effect of obscuring the invention rather than pointing it out as required by 35 U.S.C. § 112. The board's affirmance of multiplicity rejection, therefore, is based upon the view that the many different definitions of appellants' invention were both unnecessary and confusing. We disagree on both points. It is rarely possible to determine necessity for narrower claims at the time of prosecution. An applicant often does not know all the prior art which may be asserted against his broader claims when he litigates his patent. Further, he is never sure that the broader claims will not be successfully attacked on other grounds when litigated in the courts. See, e. g., Graver Tank & Mfg. Co. v. Linde Air Products, 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949). Moreover, there is no statutory authority for rejecting claims as being "unnecessary." For these reasons, an applicant should be allowed to determine the necessary number and scope of his claims, provided he pays the required fees and otherwise complies with the statute. This brings us to the board's view that the number of claims was so large as to obscure the invention, thereby failing to comply with the second paragraph of 35 U.S.C. § 112. Again we disagree. Each appealed claim is relatively brief and clear in its meaning. Examination of forty claims in a single application may be tedious work, but this is no reason for saying that the invention is obscured by the large number of claims. We note that the claims were clear enough for the examiner to apply references against all of them in his

first action. We conclude that the board erred in affirming the multiplicity rejection.

### (b) *The rejections on Horne*

We now come to the rejections under 35 U.S.C. § 102 and § 103 based on the Horne patent. Horne was cited under section 102(e) and applicants sought to remove the reference by submitting affidavits under Rule 131. The examiner found that the affidavits were insufficient in breadth to remove Horne as a reference against the claims. He considered the claims broad as against Horne in several respects which we shall separately treat.

██ The first aspect of breadth considered by the examiner was that the claims contain no limitation as to catalytic impurities which he believed would be present in the product and would affect its properties. Horne used Ziegler type catalysts. The affidavits show appellants' use of lithium-based catalysts. The claims cover products containing either type impurity, and the examiner considered them broad for this reason. The board apparently agreed, pointing out that the type of catalyst used might result in significantly different products. Appellants disputed vigorously that their product contained any lithium end groups. We find it unnecessary to decide that question here, because there is no convincing evidence in the record that the presence or absence of such impurities would affect the product. Since the claims do not recite the presence or absence of any impurities other than the naturally occurring ones. we must conclude that such limitations are not essential to appellants' case for patentability. Appellants should not be required to show how various nonessential impurities could be added to the recited elements of their polymer. This is making a breadth problem where none exists.

██ The second aspect of breadth considered by the examiner was the gel content of the product. It was the examiner's position that the product shown in appellants' Rule 131 affidavits "is not the same polymer disclosed by Horne and does not support the broad claim." This conclusion was derived from the fact that the product shown in the attachments to the affidavits was stated therein to contain "considerable hard, non-dispersable gel," whereas Horne states that his product is adaptable to be gel-free. Although the board nowhere mentioned this issue, we consider it to have been fairly raised by the examiner. It is necessary, in treating this issue, to separate the claims which contain no limitation as to the presence or absence of gel from the claims which recite that the product must be "substantially gel-free." [1]

As to the first group, the examiner's contention that the product shown in the affidavits, called CPP 1196,[2] does not "support the claim" is irrelevant. It is uncontested that CPP 1196 is in fact a compound falling under this first group of claims. The fact that it alone would not support the broader claims is of no significance. See In re Clarke, 356 F.2d 987, 991, 53 CCPA 954, 960 (1966). Turning to the examiner's argument that the affidavits are insufficient because they do not show the composition which the reference shows, this court rejected such a test in *Clarke*, supra, and stated instead that "antedating affidavits must contain facts showing a completion of 'the invention' commensurate with the extent the invention is shown in the reference, whether or not it be a showing of the identical disclosure of the reference." It is clear those claims which recite nothing about gel do not define an invention predicated for patentability upon the presence or absence of gel. With regard to the recited elements of these claims, we believe appellants have shown as much as Horne shows. Appellants show in

---

1. The latter group comprises claims 2, 7, 16, 21, 25 and 30.

2. The examiner referred to this product as CP 1198. This was apparently inadvertent, since we find no other reference in the record to a product so designated.

their affidavits the manufacture of the claimed product by the use of lithium-based catalysts. Horne shows its preparation using Ziegler catalysts. Appellants possessed the claimed product as fully as Horne did, and before the Horne date. Horne is therefore overcome as a reference as to these claims.[3] See In re Rainer, 390 F.2d 771, 55 CCPA 853 (1968).

We now consider the claims reciting a "substantially gel-free" polymer. Here, of course, we cannot ignore the significance of the fact that appellants' affidavits do not show possession of a gel-free product. The issue is whether Horne enables persons of ordinary skill to make the gel-free product. The Horne patent is far from clear on this point. It states, in part:

> The process described herein is *adaptable* to give a linear polyisoprene rubber which * * * is free of extremely high molecular fractions or cross-linked fractions, called gel, such as are present in natural rubber. (Emphasis ours.)

The examiner believed Horne's product to be gel-free. His opinion is supported by Horne's example 1, which states that a clear solution of the reaction product in heptane is obtained, which upon precipitation, washing and drying "is found to possess a tackiness equivalent to that of *milled* natural rubber * * *." (Emphasis ours.) Milling is one of the ways of removing the gel from natural rubber. The last-quoted portion of Horne would therefore indicate that the product has no substantial gel. Moreover, while appellants have pointed out the lack of complete clarity in Horne's statement concerning gel, they have not argued that Horne's example 1 does not in fact produce a gel-free product. On the basis of the record before us, we conclude that the examiner was correct in his view that

Horne discloses a substantially gel-free product. Since appellants' affidavits do not show their possession of such a product prior to the Horne date, we must affirm the board's decision as to claims 2, 7, 16, 21, 25 and 30.

### (c) *The rejection on Davis*

The examiner rejected all of the fully prosecuted claims as unpatentable over Davis, under 35 U.S.C. § 103. The examiner acknowledged that Davis does not show a complete removal of all impurities from natural rubber. His position was that "the pure compound is so similar to the impure compound (no non-obvious utilitarian differences accountable to the purity level have been shown) as to be prima facie obvious." The board affirmed the rejection "for the reasons fully set forth by the Examiner," adding that the word *synthetic* in the claims is applicable to natural rubber "from which the impurities have been extracted in Davis."

We do not think that Davis is effective as a reference against any of the claims.[4] Davis describes the separate work of various researchers in removing proteins and resins from natural rubber. The description of each elimination attempt is brief, and a complete statement of results does not appear. Moreover, Davis nowhere mentions the elimination of sugars and soaps.

We turn first to the board's view that the word "synthetic" as used in the claims is applicable to natural rubber from which impurities have been removed. We cannot agree that this is a reasonable construction of "synthetic." The dictionary meaning of the word as it pertains to chemistry is shown by the following:

> Of, pertaining to, or formed by artificial synthesis. Webster's New International Dictionary (1932).

---

3. It might be noted here that the examiner mentioned other aspects of breadth, such as molecular weight and molecular weight distribution. Since these assertions were not supported by reference to appropriate evidence of record, we consider any issues based thereon not to have been raised below.

4. From this point on we are discussing only the claims still in issue, i. e., claims 1, 3, 5, 6, 8, 10–15, 17, 19, 20, 22, 24, 26, 28, 29 and 31.

Noting or pertaining to compounds formed by chemical reaction in a laboratory, as opposed to those of natural origin. Random House Dictionary (1969).

"Synthetic rubber" is defined as

any of several substances similar to natural rubber in properties and uses, produced by the polymerization of an unsaturated hydrocarbon, as butylene or isoprene, or by the copolymerization of such hydrocarbons with styrene, butadiene, or the like. Random House Dictionary (1969).

The foregoing definitions nowhere mention or suggest to us that a purified natural product could properly be called "synthetic." Rather, the word connotes an artificially compounded or built-up product.

Moreover, to persons skilled in the rubber art the word "synthetic" would not include a purified natural product. This is demonstrated in the Horne patent, wherein synthetic is defined as "man-made." The preliminary portions of appellants' specification lead to the same conclusion. The specification draws a sharp and consistent distinction between synthetic rubbers on the one hand and products made from natural rubber on the other.

In view of the foregoing, we must disagree with the board's position that the word "synthetic," as used in the claims, would be applicable to the purified natural product.

█ We turn now to the examiner's view, adopted by the board, that the synthetic product is so similar to the natural product, purified to the extent allegedly shown in Davis, as to be "prima facie obvious." We would agree with this conclusion as a tentative one based on similarity of structure and gross characteristics. However, such tentative conclusions of obviousness are rebutted in those instances where there was, at the time the invention was made, no known or obvious method of making the claimed composition, or where the claimed composition is found to possess unexpected characteristics. At least the first situation is present in the case before us, since it cannot be said that a method of making the claimed synthetic product would be known or obvious from Davis. On the contrary, the record before us shows that years of effort in the art were required after Davis to find such a method. We conclude, therefore, that the rejection for obviousness based on Davis cannot be supported.

(d) *The rejection for "not properly defining the invention."*

█ In the final rejection, the examiner stated that certain claims "are rejected as not properly defining the invention (35 U.S.C. § 112)." He stated three bases for this conclusion, two of which have been removed through amendment. The remaining basis is the examiner's view, mentioned above, that applicant's polymers contain lithium end groups, which were not recited in the claims. Presumably this position is limited to the examples wherein appellants disclose the use of lithium-based catalysts. Such a ground of rejection cannot be sustained. Section 112 does not require that the claims define "the invention," whatever that would mean. It is apparently the second paragraph of that section which is in issue, and that paragraph requires that the claims define "the subject matter which the applicant regards as his invention." The meaning of this provision is simply that an applicant is required to set definite boundaries on the patent protection sought. The record before us amply demonstrates that appellants did not regard catalytic impurities as even being present in their products, much less regard such impurities as an element of their invention.

█ The examiner's answer possibly shifted his statutory basis for the § 112 rejection, stating: "The claims are rejected under 35 U.S.C. § 112 as being broader than that invention clearly described in the specification." A breadth rejection such as this is really an assertion that the specification is insufficient to support claims of the breadth sought.

See In re Cavallito, 306 F.2d 505, 49 CCP A 1335 (1962). The proper statutory basis for such a rejection is the *first* paragraph of § 112.[5] In response to this possible shift in ground by the examiner, appellants submitted a reply brief under Rule 193(b). The board refused to consider the reply brief and held that the examiner's answer did not raise a new point of argument. We are not sure whether an attack on the specification was being made. If it was, appellants were deprived of an opportunity to contest this new basis for the § 112 rejection before the board. Further, the board's opinion makes no reference to insufficiency of disclosure. Accordingly, we shall not consider it to be in issue before us.

■ We turn, therefore, to the board's affirmance of the rejection for indefiniteness under the second paragraph of § 112. The board set forth two bases for concluding that the claims were indefinite. The first was that the use of a negative limitation excluding the characteristics of the prior art products causes the claims to read on a virtually unlimited number of materials, many of which "might be the full equivalents in their effects of those excluded." We fail to see how this renders the claims indefinite. The complaint seems to be that a very large number of substances are encompassed by the claims, through the possible addition of unrecited impurities. The scope of the claim is still definite, however, because each recited limitation is definite.

■ The board's second basis for concluding indefiniteness was that the claims

[read] better upon the natural product from which the named substances have been removed than upon that prepared by the disclosed method of this application, which obviously never had these substances present to contend with in the first place.

With this we disagree for the reasons stated above with regard to the Davis reference. Appellants have excluded from the scope of their claims any purified natural product by the recitation "synthetic." This word, as we have shown above, has a reasonably precise meaning and therefore does not render the claims indefinite. It is not contended, and we are not holding, that the word *synthetic* alone makes the claimed composition new. We are holding that, as used here, the word is not indefinite and does not provide a basis for rejecting the claims under the second paragraph of § 112. We conclude that the board erred in affirming the rejection under 35 U.S.C. § 112.

The decision of the board is affirmed as to claims 2, 7, 16, 21, 25 and 30, and reversed as to claims 1, 3, 5, 6, 8, 10–15, 17, 19, 20, 22, 24, 26, 28, 29 and 31.

Modified.

---

5. See In re Borkowski (PA 8214) Cust. & Pat.App., 422 F.2d 904 decided concurrently herewith.