**In re Horst HARNISCH.**

**Appeal No. 79–614.**

United States Court of Customs
and Patent Appeals.

June 12, 1980.

Leonard Horn, New York City, attorney
of record, for appellant.

Joseph F. Nakamura, Washington, D. C.,
for the Commissioner of Patents and Trade-
marks, Fred E. McKelvey, Washington, D.
C., of counsel.

Before MARKEY, Chief Judge, and
RICH, BALDWIN, MILLER and FORD,
Judges.[*]

RICH, Judge.

This appeal is from the decision of the
United States Patent and Trademark Office
(PTO) Board of Appeals (board) rejecting,
under 37 C.F.R. 1.196(b), claims 1 and 3–8 [1]
of appellant's application, serial No. 559,978,
filed March 19, 1975, for "Coumarin Com-
pounds," on the sole ground that these
claims are "drawn to improper Markush
groups." We reverse.

### The Invention

The claimed compounds encompass cou-
marin compounds useful as dyestuffs.
Some of them may be used as intermediates
to make other dyestuffs. Claim 1 is repre-
sentative and reads as follows:

1. Coumarin compounds which in one
of their mesomeric limiting structures
correspond to the general formula

---

[*] The Honorable Morgan Ford, Judge, United
States Customs Court, sitting by designation.

1. The board also newly rejected claim 6 as
indefinite under 35 U.S.C. § 112 due to an
improper dependence and claim 8 as improper-
ly dependent from two claims, 7 and 4. Appel-
lant acknowledges in his brief that no appeal is
taken from either of these rejections, wherefore
we need not consider them.

wherein

 X represents aldehyde, azomethine, or hydrazone,

 $R^1$ represents hydrogen or alkyl,

 $Z^1$ represents hydrogen, alkyl, cycloalkyl, aralkyl, aryl or a 2-or 3-membered alkylene radical connected to the 6-position of the coumarin ring and

 $Z^2$ represents hydrogen, alkyl, cycloalkyl, aralkyl or a 2-or 3-membered alkylene radical connected to the 8-position of the coumarin ring

and wherein

 $Z^1$ and $Z^2$ conjointly with the N atom by which they are bonded can represent the remaining members of an optionally benz-fused heterocyclic ring which, like the ring A and the alkyl, aralkyl, cycloalkyl and aryl radicals mentioned, can carry further radicals customary in dyestuff chemistry.

Claims 3–6 depend from claim 1, adding further limitations with respect to the substituents; claim 7 is an independent claim of the same type as claim 1 but of much greater length in naming substituents, and claim 8 depends therefrom as well as from claim 4.

The instant coumarins are said to be useful for dyeing synthetic or natural fibers, plastics, and liquids such as oils and lacquers. Of apparently significant commercial value is the dyeing of either the aqueous or organic based inks preferred in rotary gravure printers for non-textile articles.

Clear shades of yellows to oranges are purportedly achieved with good fastness properties. In addition, a strong chartreuse to yellow fluorescence supposedly occurs upon exposure to either natural or ultraviolet light. The fluorescence is said to be especially suitable for tunable dye lasers.

### The Rejection

The examiner, relying on no prior art, rejected claims 1 and 3–8 under 35 U.S.C. § 121 "as containing an improper Markush group and misjoinder." More explicit reasons were said to be set forth in the earlier Office Action of May 12, 1976. In that action the examiner enumerated ten species of compounds encompassed by the claims. Beside each group he listed the various PTO class 260 subclasses into which the species fall.

The significance of this segmentation was declared to be twofold. In the examiner's words,

 A reference anticipating one member [of the listed groups] would not render any other member obvious under 35 U.S.C. § 103. The members are not so few in number or so closely related that a search and examination of the entire claim cannot be made with [sic, without?] serious burden.

### The Board

The board summarily reversed the rejection of the appealed claims under 35 U.S.C. § 121. Citing our decisions in *In re Weber*, 580 F.2d 455, 198 USPQ 328 (CCPA 1978), and *In re Haas*, 580 F.2d 461, 198 USPQ 334 (CCPA 1978), decided subsequent to the examiner's rejection, the board stated that "35 U.S.C. § 121 does not form the basis for rejection of a claim * * *."

A new rejection was then made by the board under 37 C.F.R. 1.196(b),[2] rejecting the claims as "drawn to improper Markush groups." After a lengthy listing of decisions from 1925 to 1953 reviewing "Markush practice," by the Commissioner, the

---

**2.** 37 C.F.R. 1.196(b), in relevant part, reads:

 (b) Should the Board of Appeals have knowledge of any grounds not involved in the appeal for rejecting any appealed claim, it may include in its decision a statement to that effect with its reasons for so holding, which statement shall constitute a rejection of the claims. * * *

board, and this court,[3] the board expounded its theory of the propriety of its new "improper Markush group" rejection solely on the basis of "judicially created doctrine," as follows (our emphasis):

Applying the facts of this case to the principles enunciated, we find that the members of the Markush groups of the claims do not belong to a known or recognized genus and possess widely different physical or chemical properties. Aside from the obvious fact that the compounds encompassed by the claims are *not functionally equivalent,* said compounds, considered as a whole, *are so dissimilar and unrelated chemically or physically that it would be repugnant to accepted principles of scientific classification to associate them together as a generic group.* For example, the types of derivatives encompassed by the Markush claim may include polyfused N-heterocyclics, cyclic, acyclic and aromatic amines, aryloxyalkylamines, amides, sulfonamides, phthalimides, quaternary ammonium salts, phosphorous heterocyclics, phosphates, aldehydes, azomethines, hydrazones, ethers, esters, halogens, alcohols, nitriles, piperidines, furanes, pyrroles, indoles, amongst others. It is clear that on this record the involved compounds *cannot be considered functionally equivalent,* in fact, some being no more than intermediates for the others. The foregoing is borne out by the record wherein appellant discloses that *the various groups or compounds possess differ-ent physical or chemical properties.* Nowhere in the record has it been established or even alleged that the variety of compounds included within the explicit scope of the claims are recognized by the art as being functionally equivalent. The functional groups involved herein, as exemplified above, are so structurally diverse they would be expected to possess dissimilar and unrelated chemical and physical properties. *The mere fact that there is a single structural similarity (i. e., the coumarin group) is not in itself sufficient reason to render all the embodiments functionally equivalent, particularly when the ultimate properties of the final products would not be expected to possess any recognized functional relationship.* Thus, the fact that the coumarins are in most part indicated as being dyestuffs (others being intermediates for dyes) is not sufficient, since, depending upon their structure, they may be subject to different modes of application and use.

### Appellant's Position

Appellant, picking up the board's statement that its rejection "has basis in judicially created doctrine," as shown by the cases it cited, rather than in the patent statutes, asks this court, first, whether claims can be rejected on a judicially-created doctrine rather than on some statutory basis, such as 35 U.S.C. § 121 on which the examiner relied. If they can, then appellant asks, second, whether the compounds

---

**3.** As detailed by the board:

Markush practice has a long history in the Office dating back to at least *Ex parte Markush,* 1925 CD 126, 340 OG 839. Since that time, the Office and the Court of Customs and Patent Appeals had considered rejections based on the propriety and/or limitations of Markush-type claims. See, for example, *Ex Parte Palmer et al.,* 1930 CD 3, 398 OG 707; *Ex parte Burke,* 1934 CD 5, 441 OG 509; *Ex parte Dahlen,* 1934 CD 9, 441 OG 510; *In re Swenson et al.,* 30 CCPA 764, 132 F.2d 336, 1943 CD 175, 56 USPQ 180 (1942); *In re Hass et al.,* 31 CCPA 895, 141 F.2d 122, 1944 CD 234, 60 USPQ 544 (1944); *In re Kingston,* 32 CCPA 1013, 149 F.2d 181, 1945 CD 297, 65 USPQ 371 (1945); *In re Ruzicka et al.,* 32 CCPA 1165, 150 F.2d 550, 1945 CD 449, 66 USPQ 226 (1945); *In re Archbold,* 33 CCPA 725, 151 F.2d 350, 1946 CD 63, 67 USPQ 102 (1945); *In re Thompson et al.,* 33 CCPA 942, 154 F.2d 189, 1946 CD 280, 69 USPQ 148 (1946); *In re Winnek,* 34 CCPA 946, 160 F.2d 572, 1947 CD 280, 73 USPQ 225 (1947); *In re Jones,* 34 CCPA 1150, 162 F.2d 479, 1947 CD 484, 74 USPQ 149 (1947); *In re May et al.,* 36 CCPA 833, 172 F.2d 593, 1949 CD 119, 80 USPQ 515 (1949); *In re Schechter et al.,* 40 CCPA 1009, 205 F.2d 185, 1953 CD 323, 98 USPQ 144 (1953).

Additional analysis of Markush practice appears particularly in the following articles:

Kelly et al., *Markush Claims,* 37 JPOS 164 (1955), (a 75-page exhaustive review of the practice by a committee of the Michigan Patent Law Association).

Walterscheid, *Markush Practice Revisited,* 61 JPOS 270 (1979).

claimed are sufficiently closely related to be joined in the same claim.

On the first point, appellant seems to assume some unstated specific "doctrine" on which the board acted, against which he inveighs, and which he says cannot stand, urging us not to create a "doctrine." ·

On the second point, appellant discusses the fact situation underlying the appealed claims, showing that the compounds are all dyestuffs, that the members of group X, claim 1, are closely related, that the compounds are all coumarins, and cites two board opinions reversing rejections by the examiner of claims structured similarly to appellant's claims, namely, *Ex parte Brouard*, 201 USPQ 538 (Bd.App.1976), and *Ex parte Taylor*, 167 USPQ 637 (Bd.App. 1969). The former case, like this one, involved a claim 24 to a dyestuff defined by structure containing, inter alia, a substituent "B" the definition of which included a list of alternatives occupying about a column in the USPQ report. The rejection reversed was on the ground of "improper Markush group" and misjoinder of independent and distinct inventions.

### The PTO Position

The solicitor's brief contains helpful digests of certain key cases selected from the many which discuss "Markush practice" from its inception in 1924 through 1979. It supports the board's new rejection on the ground the claims are drawn to "improper Markush groups." After stating that "Markush practice" is one of long standing and involves a vast body of precedent, the brief relies primarily on the following contentions: (1) there need not be a specific statutory basis for the rejection, citing by analogy obviousness-type double patenting rejections which are case-law based; (2) the materials set forth in the "Markush group" ordinarily must belong to a recognized physical or chemical class or to an art-recognized class; and (3) the claimed group must not be "repugnant to accepted principles of scientific classification."

A principal factual contention in the solicitor's brief is that appellant's claimed compounds include (1) dyestuffs, (2) intermediates for making dyestuffs, or (3) both, and fails to reveal the utility per se of each compound. However, at oral argument the solicitor announced with admirable candor that, having considered appellant's reply brief, he had concluded that there is in fact no class "(2)" because all of the claimed compounds are dyestuffs though some of them could also be used as intermediates to make still other dyestuffs.

The solicitor also cited authority to the effect that each "improper Markush" case must be decided on the basis of its own facts. He also stated that current PTO "Markush practice" is as set forth in section 706.03(y) of the Manual of Patent Examining Procedure (MPEP), 3d ed., Rev. 46, July 1976, reproduced in full as an appendix hereto.

### OPINION

We will first express our views concerning the PTO's reliance on "judicially created doctrine" in its rejection of claims for "improper Markush grouping." Appellant injected this point into the case by contending that the PTO had no right to rely on doctrine because a statutory basis for rejection must be stated. He also seems to contend that there is no "doctrine" and that while this court could create one it should not do so. In consequence, much of the oral argument was involved with the court trying to find out from the solicitor what, if any, "doctrine" was being relied on by the PTO, no clear answer being forthcoming—with good reason.

Upon reflection and consideration of the cases cited by the board, the discussion of those and others by the solicitor, and the recorded history of Markush practice, it appears to us that all of the discussion of "doctrine" is beside the point because there is no "Markush doctrine." Appellant never made clear or specific what "doctrine" he was referring to and the solicitor, justifiably, was unable to point one out to us.

"Markush" was the name of an applicant for patent (Eugene A. Markush) who happened to use in a claim a type of definition

of a genus or subgenus by enumeration of species, which he did not devise and which had been used before in patent claims.[4] The examiner considered the claim to be "alternative" in form, objected to it, and Markush petitioned the Commissioner. Assistant Commissioner Kinnan, in *Ex parte Markush*, 1925 CD 126 (Com.Pat.1924), approved the form of claim and granted the petition, thus requiring the examiner to examine it for patentability. Thus the name "Markush" became attached to a type of claim expression, and that is all it connotes. As others rang changes on the type of expression used by Markush and approved by Assistant Commissioner Kinnan, further decisions and opinions on petitions and in appeals ensued and a considerable body of case law evolved, approving and disapproving various forms of Markush-type expression, from which cases a number of *rules* can be deduced. Like other bodies of case law, however, the body pertaining to what may properly be called Markush *practice* has not been altogether consistent and has evolved through the years. Among the inconsistent decisions, some of them were by this court. In the PTO, one of the changes that took place was the abandonment of the rule against the use of "or" in an enumeration of alternative materials that might be used in a claimed invention, which rule was the basis of the objection giving rise to the *Markush* decision. A specific example will be found in MPEP 706.03(y). Not long ago, by a Notice under date of May 1, 1974, the PTO set up a "Practice Re Markush-Type Claims" and later incorporated the Notice in MPEP section 803. Since the MPEP revision of July 1978, that practice has not been followed because of two decisions of this court and MPEP 803 now contains this statement:

## PRACTICE RE MARKUSH–TYPE CLAIMS

The subject matter formerly under this subtitle has been cancelled in view of the

decisions *In re Weber et al.*, 198 USPQ 328 (CCPA 1978); and *In re Haas*, 198 USPQ 334 (CCPA 1978).

Thus have decisions changed the Markush practice.

It is also clear that Markush practice does not refer to a *single* rule. As may be seen from MPEP 706.03(y) set forth in the appendix, the PTO has one practice with respect to claims directed to compounds per se and a different one when they are directed to a process or composition involving a combination of steps or ingredients wherein the Markush-type definition-by-enumeration is used in defining a process step or composition element.

■ In summary, there is no "doctrine" to be considered but only a body of case law, emanating from both "higher" and "lower" authority, not altogether consistent, the latest decisions tending to carry the most weight as precedent.

Coming now to appellant's first contention that the board had no right to rely on "judicially created doctrine," we note that a doctrine, by definition, is, according to Black's Law Dictionary, revised 4th ed., "A rule, principle, theory, or tenet of the law." As is clear from the entire board opinion, what it meant was that it intended to rely on rules, principles, or tenets derivable from the cases it cited which would enable it to determine whether the claims before it were or were not in proper form to be examined for patentability. Our ruling on this point is that it had a perfect right to do so. But there is not one "doctrine" or rule; there are many.

The next questions are whether the board correctly interpreted the facts and whether it correctly applied the rules of law derivable from the cases to the facts. Before considering these questions, we take note of some recent history respecting Markush practice.

---

4. The *Markush* opinion points out that in another division of the Patent Office claims "of this character" have been allowed, citing Patents Nos. 1,472,048 and 1,486,635, and that, long before that, Patent No. 901,675 contained claims in which "the letter R is used in a chemical formula as standing for CH3 or COOH" and that such claims had frequently been allowed. Markush ultimately obtained Patent No. 1,506,316, Aug. 26, 1924.

In the PTO, patent applications are examined for compliance with the statutory provisions of Title 35, United States Code, as set forth in sections 100, 101, 102, 103, and 112. These are considered to be examinations "on the merits." There are also procedural questions arising under section 121 and related PTO rules concerned with "restriction practice." *See* MPEP, Chapter 800. As shown by the *In re Haas* cases,[5] issues arose from PTO refusal to consider on the merits single claims to groups of chemical compounds of broad scope unless each claim was first broken up into a plurality of claims of lesser scope. The first PTO position was that it would neither consider *nor reject* the claims, thus foreclosing appeal to the board or to this court. After this position was held to be a rejection, the PTO promulgated its May 1, 1974 Notice, which authorized rejection on the basis of § 121, relating to restriction, thus combining the two matters of Markush practice and restriction practice. In *Haas II* (see note 6, supra), this court held that § 121 could not be used as the basis for rejecting a *single* claim or compelling its replacement by a plurality of narrower claims before examination on the merits would be made. *Haas II* was decided at the same time as *In re Weber*, supra, involving similar issues, and *Haas II* was decided on the basis of the opinion in *Weber*. We note that in *Weber* the majority opinion regarded the "improper Markush grouping" reasoning of the board as having been merely "supportive of the rejection under § 121 rather than alternative to it" and dealt only with the § 121 rejection, reversing it and remanding the case to the PTO for consideration, separately, of the "improper Markush" rejection. The concurring opinion, by the present writer, pointed out with respect to that remand, that there existed a vast body of case law relating to Markush practice. We have not yet heard again from Weber, but the present case comes to us in similar posture. Note that this case involves an improper Markush rejection by the examiner based on § 121 which the board reversed in view of *Weber*, substituting its own improper Markush rejection based only on judicial precedent and divorced from § 121.

Anent appellant's argument that the board should not be allowed to rely solely on judicial precedent, we think it should be clear from our actions in *Weber* and *Haas II* that we there recognized the *possibility* of such a thing as an "improper Markush grouping." We were and are aware that it does not have a specific statutory basis, as we are aware of an applicant's right to define what he regards as his invention as he chooses, so long as his definition is distinct, as required by the second paragraph of § 112, and supported by enabling disclosure, as required by the first paragraph of § 112. *In re Wakefield*, 57 CCPA 959, 422 F.2d 897, 164 USPQ 636 (1970); *In re Borkowski*, 57 CCPA 946, 422 F.2d 904, 164 USPQ 642 (1970).

■ In the early years of the development of Markush practice, many of the cases involved the problem of clarity— avoiding the uncertainties of alternatives and the like. More recently, the cases have centered on problems of scope, which are related to enablement. Assuming enablement, however, there remains a body of Markush-practice law regarding Markush-type claims, particularly in the chemical field, concerned more with the concept of what might be better described as the concept of unity of invention. At least the term would be more descriptive and more intelligible internationally than is the more esoteric and provincial expression "Markush practice." It is with this unity of invention concept in mind that we approach the propriety of the appealed claims.

Over thirty years ago this court decided *In re Jones*, 34 CCPA 1150, 162 F.2d 479, 74 USPQ 149 (1947), reversing an "improper Markush group" rejection of claims to chemical compounds which were growth-

5. *Ex parte Haas*, 175 USPQ 217 (Bd.App.1972), reversed, *In re Haas*, 486 F.2d 1053, 179 USPQ 623 (CCPA 1973) ("*Haas I*"); *Ex parte Haas*, 188 USPQ 374 (Bd.App.1975), reversed, *In re Haas*, 580 F.2d 461, 198 USPQ 334 (CCPA 1978) ("*Haas II*").

regulating compositions for plants, fungicides, and insecticides. Notwithstanding their various properties, the court found all of the compounds included in the claims were plant growth stimulants, thus having a common function. The court noted that in any Markush group the compounds "will differ from each other in certain respects." It laid down the proposition, with which the PTO agrees in its MPEP, that in determining the propriety of a Markush grouping the compounds must be considered as wholes and not broken down into elements or other components. It also held, in agreement with the board, that each case of this type must be considered on its own facts. Citing *Ex parte Clark*, 11 USPQ 52 (Com. Pat.1931), a case decided by the author of the original *Markush* opinion, it noted that "the inclusion in Markush groups of compounds which differed widely in some respects," namely, aliphatic, aromatic, and aralkyl compounds, had been permitted. It cited *Ex parte Dahlen*, 42 USPQ 208 (Bd. App.1938) as permitting the grouping of compounds having the same nuclei but side chains wherein there was a wide variation. It found the claims before it to cover compounds all belonging to a genus of tetralyl compounds having a substituted methyl group at position 6 and ruled that they had a community of properties justifying their grouping which was not repugnant to principles of scientific classification.

We regard the present case as similar to *In re Jones*, supra, and also the much later decision of the board in *Ex parte Brouard*, supra, in which the board reversed the examiner's "improper Markush" rejection. We conclude that the board here was factually in error in not recognizing that all of appellant's claimed compounds are dyes, as confirmed by the solicitor's admission. The board's reliance on its notion that some of the claimed compounds are "no more than intermediates" overlooked the now admitted fact that they are dyes as well. Clearly, they are all coumarin compounds which the

board admitted to be "a single structural similarity." We hold, therefore, that the claimed compounds all belong to a subgenus, as defined by appellant, which is not repugnant to scientific classification. Under these circumstances we consider the claimed compounds to be part of a single invention so that there is unity of invention as was held to be the case in *Ex parte Brouard*, supra, 201 USPQ at 540. The Markush groupings of claims 1 and 3–8 are therefore proper.

As stated above, we decide this and like cases on their facts on a case-by-case basis. It should also be clear from what we have said that we adhere to our holdings in *In re Weber*, supra, and *In re Haas (Haas II)*, supra. Nothing we have said herein is intended to change or modify them in any way; nor do we think anything said could be reasonably construed to have such an effect. The "unity of invention" concept is not to be confused with the "misjoinder under 35 U.S.C. § 121" rejection employed in *In re Weber*. In *Weber* we dealt with the use of 35 U.S.C. § 121, which deals only with restriction requirements, to support the rejection of a single claim. Here we are concerned only with the rejection of a single claim on the distinct ground that it is directed to an "improper Markush group." Reference to the widely-recognized concept of "unity of invention" has been made in order to suggest an appropriate term to apply where *unrelated* inventions are involved—inventions which are truly independent *and* distinct.[6] This case, we find, does not involve such inventions.

Appellant expressly stated in his brief that no appeal was being taken from the rejection of claim 6 under 35 U.S.C. § 112 or of claim 8 as improperly dependent. In addition, while appellant's reasons of appeal alleged error in the board's supposed dismissal of claims 9–14 and 23–25, this al-

---

6. Having recognized the possibility of rejecting a Markush group type of claim on the basis of independent and distinct inventions, the PTO may wish to anticipate and forestall procedural problems by exercising its rulemaking powers under 35 U.S.C. § 6(a), wherein the views of interested parties may be heard.

leged error has not been argued and is therefore deemed abandoned. The appeal with respect to claims 6, 8–14, and 23–25 is therefore *dismissed*.

The board's rejection of claims 1 and 3–8 as based on "improper Markush groups" is *reversed*.

REVERSED.

## APPENDIX

### 706.03(y)  Improper Markush Group

[R–49]

*Ex parte Markush*, 1925 C.D. 126; 340 O.G. 839, sanctions, in chemical cases, claiming a genus expressed as a group consisting of certain specified materials. This type of claim is employed when there is no commonly accepted generic expression which is commensurate in scope with the field which the applicant desires to cover. Inventions in metallurgy, refractories, ceramics, pharmacy, pharmacology and biology, may be claimed under the Markush formula but it has consistently been held to be improper to extend it to purely mechanical features or process steps. It is improper to use the term "comprising" instead of "consisting of". *Ex parte Dotter*, 12 USPQ 382. Regarding the normally prohibited inclusion of Markush claims of varying scope in the same case, see *Ex parte Burke*, 1934 C.D. 5; 441 O.G. 509.

The use of Markush claims of diminishing scope should not, in itself, be considered a sufficient basis for objection to or rejection of claims. However, if such a practice renders the claims indefinite or if it results in undue multiplicity, an appropriate rejection should be made. This practice with respect to Markush claims of diminishing scope is being continued.

The materials set forth in the Markush group ordinarily must belong to a recognized physical or chemical class or to an art-recognized class. However, when the Markush group occurs in a claim reciting a process or a combination (not a single compound), it is sufficient if the members of the group are disclosed in the specification to possess at least one property in common which is mainly responsible for their function in the claimed relationship, and it is clear from their very nature or from the prior art that all of them possess this property. While in the past the test for Markush-type claims was applied as liberally as possible, present practice which holds that claims reciting Markush groups are not generic claims (§ 803) may subject the groups to a more stringent test for propriety of the recited members. Where a Markush expression is applied only to a portion of a chemical compound, the propriety of the grouping is determined by a consideration of the compound as a whole, and does not depend on there being a community of properties in the members of the Markush expression.

When materials recited in a claim are so related as to constitute a proper Markush group, they may be recited in the conventional manner, or alternatively. For example, if "wherein R is a material selected from the group consisting of A, B, C and D" is a proper limitation then "wherein R is A, B, C or D" shall also be considered proper.

### SUBGENUS CLAIM

A situation may occur in which a patentee has presented a number of examples which, in the examiner's opinion, are sufficiently representative to support a generic claim and yet a court may subsequently hold the claim invalid on the ground of undue breadth. Where this happens the patentee is often limited to species claims which may not provide him with suitable protection.

The allowance of a Markush type claim under a true genus claim would appear to be beneficial to the applicant without imposing any undue burden on the Patent and Trademark Office or in any way detracting from the rights of the public. Such a subgenus claim would enable the applicant to

claim all the disclosed operative embodiments and afford him an intermediate level of protection in the event the true genus claims should be subsequently held invalid.

The examiners are therefore instructed not to reject a Markush type claim merely because of the presence of a true genus claim embracive thereof.

See also §§ 608.01(p) and 715.03.

See § 803 for restriction practice re Markush-type claims.